UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| TERRI L. TATRO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:18-CV-204 PLC |
| | ) |
| ANDREW M. SAUL,[1] | ) |
| Commissioner of Social Security | ) |
| | ) |
| Defendant. | |

**MEMORANDUM AND ORDER**

Plaintiff Terri Tatro seeks review of the decision by Defendant Social Security Commissioner Andrew Saul denying her application for Supplemental Security Income (SSI) under the Social Security Act. For the reasons set forth below, the case is reversed and remanded.

**I.    Procedural History**

In November 2015, Plaintiff, then forty-six years old, filed an application for SSI, alleging that she became disabled on December 19, 2014[2] due to: depression, arthritis, PTSD, and high blood pressure. (Tr. 75, 159-64) The Social Security Administration (SSA) denied her application and, in April 2016, she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 87-91, 94). In July 2017, Plaintiff submitted a "dire need" request stating that she was homeless, and the SSA granted Plaintiff's case "special expedited processing." (Tr. 114-116)

---

[1] At the time this case was filed Nancy A. Berryhill was the Deputy Commissioner of Social Security.
[2] Prior to the administrative hearing, Plaintiff amended the alleged onset date of disability to December 9, 2015, the date she filed her application for SSI. (Tr. 183-87)

The ALJ conducted a hearing in March 2018, at which Plaintiff and a vocational expert testified. (Tr. 30-74) In a decision dated April 3, 2018, the ALJ found that Plaintiff "has not been under a disability, as defined in the Social Security Act, since November 24, 2015, the date application was filed[.]" (Tr. 12-25) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied the request. (Tr. 1-5, 158) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. Evidence before the ALJ

Plaintiff testified that she was forty-five years old and had a bachelor's degree in health and human services. (Tr. 56) Since her husband died in January 2015, Plaintiff had not had "a stable place to stay" and "bounc[ed] back and forth" between the homes of two friends. (Tr. 35)

Plaintiff most recently worked on a "sensory panel" for J. Reckner from 2012 through 2014. (Tr. 40) Plaintiff worked "either an hour a day or three hours a day…four days a week," and the job required her to enter a room, "circle around the room and we'd write down if we smelled something or if we didn't smell something and we had to rate how strong the smell is." (Tr. 40-41) Plaintiff left J. Reckner because her mental and physical conditions were "getting worse," she "started getting anxiety issues," and "it was very difficult for me" to "walk around the room." (Tr. 42, 60)

Plaintiff testified that she received mental health treatment from Linda Hammonds, whom she saw every two months.[3] (Tr. 52) In addition, Plaintiff received counseling from Ms. Schumacher "usually every two weeks, but for the last two months it's been about every week." (Tr. 52) Plaintiff testified that, despite, taking "a lot" of medication, "I still have hallucinations.

---

[3] Although Plaintiff and the ALJ referred to Linda Hammonds as "Doctor," the medical records establish that she was a psychiatric nurse practitioner. (See Tr. 290)

2

I still have lack of concentration. I still have anxiety and depression." (Tr. 53) When the ALJ asked Plaintiff what, if anything, triggered her anxiety, she answered: "Not anything in particular. I just have to be minding my own business, doing whatever, and I'll just have an onset of anxiety, very overwhelming feeling, overwhelmingness." (Tr. 54) For example, she recalled "a few times towards the end" of her employment at J. Reckner when she "wanted to just stand up and scream, just scream." (Id.)

When asked to describe a typical day, Plaintiff stated: "Well, it takes me forever getting out of bed because of my depression. I'll get up, kind of watch just a little bit of the TV." (Tr. 54-55) She elaborated: "I'm very sad and I'll cry, cry a lot. I'm just tired, just very tired." (Tr. 58) Plaintiff had difficulty sleeping at night due to "[r]acing thoughts." (Tr. 58) Plaintiff estimated that she remained in bed all day three or four times per week. (Tr. 59)

In regard to her physical impairments, Plaintiff described low back pain, that radiated down her right leg. (Tr. 61) Plaintiff also experienced "numbness and tingling" in her right leg. (Tr. 61) Plaintiff's back pain required her to "reposition myself a lot when sitting," alternating between sitting up right, reclining, and walking "around for a few [minutes]." (Tr. 60-62) Plaintiff took gabapentin and Celebrex for pain, and had received injections in her low back, which she stated "are not doing me any good." (Tr. 59, 63) Plaintiff's doctor would not perform surgery on her back unless she lost weight. (Tr. 47) Plaintiff had also received "some injections" in her right hip and, at her upcoming doctor appointment, would "talk about either another shot or the surgery thing." (Tr. 47) In regard to her shoulders, Plaintiff stated: "I can barely lift with both, you know, shoulder lift." (Tr. 46)

Plaintiff's friend helped her cook and do laundry. (Tr. 37-38) Plaintiff testified that she was able to stand or walk for only "about five minutes" at a time. (Tr. 48) Plaintiff was unable to

3

carry a gallon of milk because it caused "a lot of pressure in the back," but she believed she could carry "[m]aybe like a half a gallon…." (Tr. 50-51) Plaintiff walked with a cane, prescribed by her doctor, because her "right hip will give out and I fall." (Tr. 48-49) Plaintiff wore a brace on her left knee for arthritis. (Tr. 49)

A vocational expert also testified at the hearing. (Tr. 65-70) The vocational expert classified Plaintiff's past work as "finish inspector," which was unskilled, light work. (Tr. 66) The ALJ asked the vocational expert to consider an individual with Plaintiff's age, education, and work experience and the following limitations:

> [T]his individual was limited to four hours of standing and walking in a day. They could lift 20 pounds occasionally and 10 pounds frequently. They could never climb ladders, ropes, or scaffolds. The remaining posturals are at occasional and assume balance is at occasional. Further assume that this hypothetical individual would be limited to work that is simple and routine and repetitive tasks and work environment free of fast paced quota requirements, involving only simple work-related decisions with few if any work questions, no interaction with the public, and only brief and superficial interaction with coworkers.

(Tr. 66) The vocational expert testified that such an individual could not perform Plaintiff's past relevant work, but would be able to perform sedentary jobs that existed in significant numbers in the national economy such as, table worker, machine tender, and hand assembler. (Tr. 66-67)

When Plaintiff's counsel added that the hypothetical individual "was going to be off task up to 20 percent of the work day due to psychiatric problems," the vocational expert testified that such individual could not perform the jobs previously identified. (Tr. 69-70) Likewise, if the hypothetical individual "were missing work two days per month on an ongoing basis, they would not be maintained on the job." (Tr. 70)

With respect to Plaintiff's medical treatment records, the Court adopts the facts that Plaintiff provided in her statement of material facts and the Commissioner admitted. [ECF Nos.

4

22, 27-1] The Court addresses specific facts related to the issues Plaintiff raises as needed in the discussion below.

### III. Standard of Determining Disability under the Social Security Act

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. 42 U.S.C. § 423 (a)(1); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A); See also 20 C.F.R. § 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920; see also McCoy v. Astrue, 648 F.3d 605, 511 (8th Cir. 2011). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. 404.1545(a)(1)); see also 20 C.F.R. §

416.920(e), 416.945(a)(1). Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. Id.; Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV. ALJ Decision

Applying the foregoing five-step analysis, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since November 24, 2015; and (2) had the severe impairments of "degenerative disc disease of the lumbar spine, degenerative joint disease and bursitis of the left hip, obesity, post-traumatic stress disorder (PTSD), major depressive disorder, and generalized anxiety disorder." (Tr. 14-15) Additionally, the ALJ determined that Plaintiff had the non-severe impairments of hypertension and hypothyroidism. (Tr. 15) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16)

The ALJ reviewed Plaintiff's testimony and medical records and determined that, while her "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 19) The ALJ listed Plaintiff's numerous mental health symptoms, but stated "there is no evidence that the claimant sought emergency department treatment or was ever hospitalized for psychiatric reason" and there "was no evidence of suicidal or homicidal ideation." (Tr. 19-20) The ALJ also found that Plaintiff's mental status examinations "showed

some abnormalities, but were generally within normal limits when on medication." (Tr. 19) In regard to Plaintiff's hallucinations, the ALJ acknowledged that Plaintiff "subjectively reported seeing, hearing, and feeling things," but "there was no evidence of responding to internal stimuli." (Tr. 20)

The ALJ also found inconsistencies in the treatment notes of Plaintiff's mental health care providers. The ALJ compared Ms. Schumacher's treatment notes to those of her other mental healthcare providers, stating, "[i]n contrast to treatment notes generated by the claimant's psychiatrist[4] and psychiatric nurse practitioner, the claimant's psychotherapist typically documented little improvement in her symptoms even with psychotropic medications." (Tr. 20) The ALJ further stated: "[D]espite complaints of ongoing symptoms resulting in medication adjustments, the psychiatric treatment notes show that her symptoms were overall controlled and stable with adherence to her medication regimen." (Id.) In support of this finding, the ALJ listed various instances in which psychiatric nurse practitioner (NP) Hammonds documented improvement in Plaintiff's mental health symptoms. (Id.)

Turning to Plaintiff's physical impairments, the ALJ emphasized that Plaintiff's medical records "document[ed] few significant complaints of back or hip pain until November 2016." (Id.) The ALJ also observed that the objective medical evidence and limited treatment of Plaintiff's hip pain did not support "the intensity of pain alleged by the claimant." (Tr. 21) In regard to Plaintiff's back pain, the ALJ noted that Plaintiff was referred to physical therapy but did not seek it and she was not taking any narcotic medication. (Tr. 21)

The ALJ determined that Plaintiff had the RFC to perform light work with the following limitations:

---

[4] The record contains a single treatment note from psychiatrist Dr. Mirza, who worked with psychiatric nurse practitioner (NP) Hammonds. (Tr. 449-51)

> The claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant is able to stand and/or walk for a total of four hours in an eight-hour workday. The claimant should never climb ladders, ropes, or scaffolds. The claimant can occasionally balance and perform all other postural activities. The claimant is capable of simple, routine, and repetitive tasks in a work environment free of fast-paced quota requirements, involving only simple work[-]related decisions, and with few, if any, work place changes. The claimant can have no interaction with the public and only brief and superficial interaction with co-workers.

(Tr. 17) At step four of the sequential evaluation, the ALJ found that Plaintiff was unable to perform her past relevant work. (Tr. 23) However, based on the vocational expert's testimony, the ALJ determined that there existed a significant number of jobs in the national economy that Plaintiff was able to perform, including those of table worker, machine tender, and hand assembler. (Tr. 23-24) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 25)

## V. Discussion

Plaintiff claims that substantial evidence did not support the ALJ's mental RFC determination because the ALJ improperly: (1) discounted the medical opinion of Plaintiff's treating social worker; and (2) assigned "significant weight" to the opinion of a non-examining psychological consultant. [ECF No. 21] In response, the Commissioner asserts that the ALJ "properly considered the entire record, including medical opinion evidence, in determining Plaintiff's residual functional capacity." [ECF No. 27]

### A. Standard for Judicial Review

The court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports

and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as those determinations are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to findings and conclusions" of the SSA. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

B. Treating social worker

Plaintiff claims that the ALJ erred in determining her mental RFC because substantial evidence did not support the ALJ's decision to assign limited weight to the opinion of Plaintiff's treating social worker, Carla Schumacher, MSW, LCSW. [ECF No. 12 at 5] The Commissioner counters that the ALJ properly discounted Ms. Schumacher's opinion because: (1) she was not an "acceptable medical source"; (2) she failed to provide a rationale for the limitations she found; and (3) her opinion was inconsistent with evidence that Plaintiff's condition improved with medication.

Only "acceptable medical sources" may establish the existence of a medically determinable impairment, provide a medical opinion, or be considered a treating source entitled to controlling weight. Sloane v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007); Social Security

Ruling (SSR) 06–03P, 2006 WL 2329939, at *1 (2006) (Aug. 9, 2006). In regard to mental health impairments, only licensed physicians and licensed or certified psychologists are considered "acceptable medical sources." Sloane, 499 F.3d at 888. "Other medical sources" include nurse practitioners, physician assistants, social workers, and therapists. See 20 C.F.R. § 416.913(a); Lacroix v. Barnhart, 465 F.3d 881, 886 (8th Cir. 2006). While other medical sources cannot establish the existence of a medically determinable impairment, information from such sources "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."[5] SSR 06–03P, 2006 WL 2329939, at *2. See also Nowling v. Colvin, 813 F.3d 1110, 1123–24 (8th Cir. 2016).

Plaintiff's treatment records establish that Ms. Schumacher began providing Plaintiff psychotherapy in May 2016 and continued seeing Plaintiff every two to four weeks through the time of the administrative hearing in March 2018. When Ms. Schumacher completed Plaintiff's mental RFC in April 2017, she had been treating Plaintiff for almost one year and she was aware of Plaintiff's diagnoses and medication management by Plaintiff's other providers. (Tr. 301-03)

The mental RFC assessment form required Ms. Schumacher to rate Plaintiff's "mental abilities to function on a sustained basis, 8 hours per day, five days per week, in a regular, competitive work setting."[6] (Tr. 301) The form set forth twenty-one work-related abilities in the

---

[5] The Social Security Administration addressed the value of opinions from other medical sources, stating: "[W]ith the growth of managed health care in recent years and the emphasis on containing medical costs," nurse practitioners, social workers and others "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." SSR 06-03P, 2006 WL 2329939, at *3. As such, opinions from other medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Id. (quoted in Sloan, 499 F.3d at 888–89).

[6] The form provided the following four categories for rating a claimant's ability:

areas of understanding and memory, sustained concentration and memory, social interaction, and adaptation. Ms. Schumacher opined that Plaintiff's limitations in eighteen of the twenty-one areas would preclude her from working for twenty percent of an eight-hour workday. (Tr. 301-303) Ms. Schumacher also opined that Plaintiff would: (1) miss two or more days of work per month due to psychologically based symptoms; and (2) decompensate with "even a minimal increase in mental demands or change in the environment." (Tr. 303) According to the mental RFC assessment, Ms. Schumacher based her opinion of Plaintiff's functional limitations on her biopsychosocial assessment of Plaintiff and individual counseling sessions.

In his decision, the ALJ reviewed Ms. Schumacher's mental RFC assessment and assigned it "limited weight" because Ms. Schumacher was not an acceptable medical source and she did not provide a rationale for the limitations she found. (Tr. 23) Additionally, the ALJ reasoned: "[T]he overall mental health treatment record fails to support the extreme limitations, as her mental symptoms and mental status examinations were stable with adherence to her prescribed psychotropic medication." (Tr. 23)

The record shows that, at the time she completed the mental RFC assessment, Ms. Schumacher had conducted eighteen psychotherapy sessions with Plaintiff in an eleven-month period. In fact, Ms. Schumacher saw Plaintiff more consistently and frequently than any other mental health care provider. As such, she was in a unique position to "provide insight" into the severity of Plaintiff's impairments and how they affect her ability to function. See SSR 06–03P, 2006 WL 2329939, at *2.

---

**Category I**: Does not preclude performance of any aspect of the job
**Category II**: Precludes performance for **5%** of an 8 hour work day
**Category III**: Precludes performance for **10%** of an 8 hour work day
**Category IV**: Precludes performance for **20%** of an 8 hour work day

(Tr. 301) (emphasis in original) Ms. Schumacher rated Plaintiff's mental abilities in eighteen of the twenty-one areas as Category IV, and the remaining three as Category III. (Tr. 301-03)

Plaintiff maintains that, in relying on isolated comments in Plaintiff's treatment notes to support his finding that Plaintiff's symptoms were controlled and stable, the ALJ "failed to acknowledge that the Plaintiff's symptoms waxed and waned throughout the period of treatment." [ECF No. 12 at 9] The Commissioner contends that the ALJ properly discredited Ms. Schumacher's opinion because her treatment notes typically documented less improvement than those of NP Hammonds and Dr. Mirza.[7]

An ALJ errs when he "relie[s] too heavily on indications in the medical record that [the claimant] was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001). See also Nowling, 813 F.3d at 1123. "It is possible for a person's health to improve, and for the person to remain too disabled to work." Cox v. Barnhart, 345 F.3d 606, 609 (8th Cir. 2003).

Here, the ALJ selectively cited comments in NP Hammonds' treatment notes that reflected improvement in certain symptoms. For example, the ALJ observed that, in February 2017, Plaintiff demonstrated appropriate energy level, absence of rapid and pressured speech, and reduced anxiety and hallucinations. However, NP Hammonds also noted that Plaintiff's "anxiety has improved, 'but it's still there'" and Plaintiff "continues with obsessive behaviors such as counting ceiling tiles" and "sees black dots and feels like something is crawling on her[.]" NP Hammonds increased Plaintiff's Latuda and Zoloft and discontinued buspirone.

---

[7] The record contains treatment notes from a single appointment with psychiatrist Dr. Mirza in January 2017. (Tr. 449—51) Contrary to the ALJ's statement, Dr. Mirza's treatment notes were not inconsistent with those of Ms. Schumacher. Dr. Mirza documented symptoms of "psychosis – hearing name being called, sees things crawling, black shadows," severe obsession and compulsion, mild hyperactivity and thought disruption, moderate hallucinations and anxiety, poor insight, and fair judgment. Dr. Mirza diagnosed Plaintiff with "bipolar 1 disorder – mixed – moderate," "psychotic disorder," and "generalized anxiety disorder," and he adjusted her medications.

12

Moreover, one month later, NP Hammonds observed that Plaintiff continued to feel depressed, wished to die, and slept most of the day. The ALJ also noted that in April, May, and June 2017, NP Hammonds documented Plaintiff's increased energy, improved mood, and reduced anxiety. Significantly, at those same appointments, Plaintiff reported paranoia, visual hallucinations, racing thoughts, and difficulty falling asleep.

Next, the ALJ overlooked evidence that Plaintiff's symptoms worsened in August 2017, when he cited NP Hammonds' notes that Plaintiff's "energy was variable" and Plaintiff "was able to enjoy some of her activities" and "denied racing thoughts and distractibility." At the same August appointment, Plaintiff reported mood swings and tearfulness, and NP Hammonds observed that Plaintiff's mood and affect were "depressed" and increased Plaintiff's Haldol. Finally, the ALJ pointed to NP Hammonds' January 2018 notes that Plaintiff's mood was more stable and her racing thoughts and auditory hallucinations were "much better." Significantly, at the same appointment, NP Hammonds observed that Plaintiff's mood and affect were depressed and Plaintiff continued to feel depressed "at times," think about death, and experience occasional auditory hallucinations.

Based on the above, the Court finds that the ALJ emphasized instances where Plaintiff reported doing somewhat better, rather than evaluating the evidence in the record as a whole. See, e.g., Hutsell, 259 F.3d at 712. Plaintiff's medical records demonstrated that she had better days and worse days, but she complained of continued mental health symptoms at every appointment. See, e.g., Garamella v. Berryhill, No. 4:16-CV-1891 NAB, 2018 WL 3427815, at *4 (E.D. Mo. July 16, 2018). Furthermore, the frequent adjustments in Plaintiff's psychotropic medications suggest that, contrary to the ALJ's finding, Plaintiff's symptoms were not stable and controlled with medication. The fact that Plaintiff, at various times, experienced some

13

improvements in certain symptoms did not undermine Ms. Schumacher's opinion that Plaintiff could not sustain regular employment.

The Commissioner asserts that the ALJ properly discounted Ms. Schumacher's opinion because she "failed to provide a rationale for the limitations she set forth." The Eighth Circuit has held that a "conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little to no elaboration." Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (quotation omitted). However, an ALJ may discount a medical opinion contained in a checkbox form only if those opinions stand alone and were never mentioned in the provider's numerous records of treatment nor supported by any objective testing or reasoning. Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005). Here, Ms. Schumacher's mental RFC assessment was consistent with her treatment notes. Additionally, Ms. Schumacher's treatment notes were substantially consistent with those of Plaintiff's other providers. The Court therefore finds that substantial evidence did not support the ALJ's decision to assign Ms. Schumacher's opinion little weight.

C. Psychological consultant

Plaintiff argues the ALJ erred in assigning "significant weight" to the opinion of Dr. James Callis, PhD, the state agency non-examining, psychological consultant. [ECF No. 12] The Commissioner counters that, because Dr. Callis's opinion "was consistent with the other credible medical evidence, it was proper for the ALJ to rely on it, in part, in formulating Plaintiff's RFC." [ECF No. 27 at 9]

Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. See 20 C.F.R. § 416.927. However, the rule is not absolute; a treating physician's opinion may be disregarded in

favor of other opinions if it does not find support in the record. See Prosch v. Astrue, 201 F.3d 1010, 1012-13 (8th Cir. 2012); Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007).

Dr. Callis reviewed Plaintiff's medical records and completed a psychiatric review technique and mental RFC assessment for Plaintiff in January 2016. (Tr. 78-83) Dr. Callis found that Plaintiff "has not sought treatment consistently for mental impairments." (Tr. 79) Dr. Callis wrote: "She has attended 2 exams recently with a primary care physician/nurse practitioner for complaints of symptoms of anxiety and depression. She is treated with medication, but has not required a referral to a psychological professional." (Id.) Based on his review, Dr. Callis found that the severity of Plaintiff's functional limitations was "not consistent with the level of treatment sought" and she retained "the ability to perform at least simple, repetitive tasks on a sustained basis." (Id.)

The ALJ assigned "significant weight" to Dr. Callis's opinion that Plaintiff's limitations were mild to moderate and she was capable of performing simple, repetitive tasks on a sustained basis. (Tr. 23) The ALJ reasoned that Dr. Callis was "familiar with the definitions and evidentiary standards used by the agency" and his opinion was "consistent with the medical evidence as a whole that shows improvement and controlled mental symptoms with medications and overall normal mental status examinations." (Id.) The ALJ adopted Dr. Callis's opinion in his RFC determination "with some additional limitations in social interaction." (Id.)

"[T]he opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records including relevant medical records made after the date of evaluation." McCoy v. Astrue, 648 F.3d at 515 (citing Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010)). When Dr. Callis completed his assessment in January 2016, Plaintiff's primary care provider prescribed her anti-depressants and she was not

15

receiving regular treatment from a mental health care provider. However, in May 2016, Plaintiff began regular psychotherapy sessions with Ms. Schumacher and, in November 2016, NP Hammonds took over the management of Plaintiff's psychotropic medications. Given that Dr. Callis discredited Plaintiff's complaints because she had not consistently sought treatment, and the record establishes that Plaintiff began receiving regular mental health treatment a short time later, the Court finds that substantial evidence did not support the ALJ's decision to assign significant weight to Dr. Callis's opinion.

I. **Conclusion**

For the reasons stated above, the Court finds that the ALJ failed to properly weigh Ms. Schumacher's and Dr. Callis's opinions and thus failed to properly assess Plaintiff's disability claim such that substantial evidence does not support the ALJ's determination. See, e.g., Gordon v. Astrue, 801 F.Supp.2d 846, 859 (E.D.Mo. 2011). Accordingly,

**IT IS HEREBY ORDERED** that pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

*Patricia L. Cohen*

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of January, 2020